# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **PIERSON VALLES,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 4:22-cv-00568** |
| | § | |
| **ACT, INC.,** | § | |
| **Defendant.** | § | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.     BACKGROUND FACTS ............................................................................................... 1

II.    ARGUMENT ................................................................................................................. 8

   A.   **There Is a Substantial Likelihood That Plaintiff Will Prevail on the Merits.** ......................... 9

      1.   **There Is a Substantial Likelihood That Plaintiff Will Prevail on His ADA Claims.** ............ 9

      2.   **There Is a Substantial Likelihood That Plaintiff Will Prevail on His Section 504 Claims.** 16

   B.   **There Is a Substantial Threat That Plaintiff Will Suffer Immediate Irreparable Injury If the Injunction Is Not Granted.** .................................................................................................. 16

   C.   **The Threatened Harm to Plaintiff Outweighs the Threatened Harm the Injunction May Cause Defendant ACT.** ........................................................................................................ 18

   D.   **The Granting of a Preliminary Injunction Will Not Disserve the Public Interest.** ................. 18

IV.   CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Association of Taxicab Operators, USA v. City of Dallas*,
760 F. Supp. 693 (N.D. Tex. 2010)……………………………………………….………9

*Barnett v. U.S. Air, Inc.*,
228 F.3d 1105 (9th Cir. 2000)…………………………………………….……...16

*Bedford v. Michigan*,
722 Fed. Appx. 515 (6th Cir. 2018)……………………………………...…………....11

*Blue Bell Creameries, L.P. v. Denali Co., LLC*,
2008 WL 2965655 (S.D. Tex. July 31, 2008)…………………………………………19

*Clark v. Prichard*,
812 F.2d 991 (5th Cir. 1987)…………………………………………………...………9

*Delano-Pyle v. Victoria Cnty., Tex.*,
302 F.3d 567 (5th Cir. 2002)…………………………………………………………16

*Enyart v. National Conference of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011)…………………………………………………...19

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*,
2011 U.S. Dist. LEXIS 157604 (E.D. La. March 4, 2011)………………………………17

*Janvey v, Alguire*,
647 F.3d 585 (5th Cir. 2011)…………………………………………………..………8

*Jefferson Community Health Care Centers, Incorporated, v. Jefferson Parish Gov't*,
849 F.3d 615 (5th Cir. 2017)………………………………………………………..9

*Kleiber v. Honda of Am. Mfg.*,
485 F.3d 862 (6th Cir. 2007)………………………………………………………15

*Lakedreams v. Taylor*,
932 F.2d 1103 (5th Cir. 1991)…………………………………………………...…8

*Meyer v. Holley*,
537 U.S. 280 (2003)……………………………………………………………..19

*Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*,
621 F.2d 683 (5th Cir. 1980)………………………………………………………...9

*State of Texas v. Seatrain Int'l, S.A.,*
518 F.2d 175 (5th Cir. 1975)………………………………………………………………...9

*United States v. Edward Rose & Sons,*
384 F.3d 258 (6th Cir. 2004)………………………………………………………………19

*United States v. McMillan,*
946 F. Supp. 1254 (S.D. Miss. 1995)……………………………………………………17

## STATUTES AND REGULATIONS

28 C.F.R. § 36.309(b)(1)(i)……………………………………………………...10, 15, 18

29 C.F.R. § 1630.2(h)(2)……………………………………………………………………10

29 C.F.R. § 1630.2(j)(1)(i)……………………………………………………………………11

29 U.S.C. § 1630.2(j)(1)(ii)……………………………………………………………....11

29 C.F.R. § 1630.2(j)(1)(iii)……………………………………………………………....11

29 C.F.R. § 1630.2(k)(1)……………………………………………………………………13

42 U.S.C. 2000a-3(a)………………………………………………………………………17

42 U.S.C. § 12101(3)………………………………………………………………………18

42 U.S.C. § 12102(1)………………………………………………………………………10

42 U.S.C. § 12102(2)(A)……………………………………………………………....11

42 U.S.C. § 12102(4)(E)(i)………………………………………………………………14

42 U.S.C. § 12102(4)(E)(i)(IV)………………………………………………………………14

42 U.S.C. § 12182(b)(2)(A)(ii)………………………………………………………………10

42 U.S.C. § 12188………………………………………………………………………17

42 U.S.C. § 12189………………………………………………………………………10

Fed. R. Civ. P.  65(a)………………………………………………………………...1

Fed. R. Civ. P. 65(b)………………………………………………………………....1

Plaintiff Pierson Valles ("Plaintiff" or "Pierson") hereby moves the Court, pursuant to the provisions of Rule 65(a) and (b) of the Federal Rules of Civil Procedure, for a Temporary Restraining Order and Preliminary Injunction, enjoining Defendant ACT, Inc. ("Defendant" or "ACT") and any and all of ACT's officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, from wrongfully continuing to deny him the reasonable accommodations he seeks in the form of preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).

## I.    BACKGROUND FACTS

Pierson is a seventeen year-old student high school student residing in Flower Mound, Texas, who has been diagnosed, among other things, with Mild Specific Learning Disorder with Impairment in Mathematics, Moderate Specific Learning Disorder with Impairment in Written Expression, Attention Deficit Hyperactivity Disorder, Auditory Processing and Working Memory Deficits, Visual Processing Deficits, and Fine Motor/Handwriting Deficits.  Plaintiff's Original Verified Complaint ("OVC"), at ¶ 16.  Individually and collectively, these diagnoses reflect that Pierson has one or more disabilities as defined by the ADA and Section 504.  *Id*.

These diagnoses appear, for example, in a report drafted by a licensed psychologist drafted in 2022 based on testing in January of that year.  OVC, at ¶ 17.  *See also generally* Psychoeducational Report of Dr. Lisa M. Elliott ("Elliott Report," attached as Exh. B).  As explained in that report, Pierson's attention difficulties, visual processing issues, and other disability manifestations increased as a result of four concussions, the latest of which required him to undergo a concussion cognitive rehabilitation protocol.  OVC, at ¶ 17; Elliott Report, at 1-2.  Testing demonstrated a Very Superior rating on the General Abilities Index, which the licensed psychologist considered a more accurate estimate of Pierson's true abilities than the Full Scale IQ test.  OVC, at ¶ 17; Elliott Report, at 2.  Pierson demonstrated significant weaknesses

1

with respect to short-term working memory and processing speed skills, along with moderate difficulties with auditory attention, auditory processing, and auditory working memory.  OVC, at ¶ 17; Elliott Report, at 2.  The licensed psychologist recommended preferential seating and extended test time for all classes and testing.  OVC, at ¶ 17; Elliott Report, at 5-7.  The licensed psychologist specifically noted the need for extended time on the ACT and other standardized examinations.  OVC, at ¶ 17; Elliott Report, at 5.

Pierson is preparing to apply for early admission to college and must take standardized tests to give himself a fair and equitable opportunity for such early admission into his preferred schools.  OVC, at ¶ 18.  Colleges and universities use such scores as a tool to compare the relative abilities of applicants.  *Id.*

Defendant ACT, Inc., develops and administers the ACT[1] exam, a standardized examination used by many colleges and universities throughout the United States.  OVC, at ¶ 19.  As noted on ACT's website, "[e]ach year, ACT serves millions of students, job seekers, schools, government agencies, and employers in the US and around the world with learning resources, assessments, research, and credentials designed to help them succeed from elementary school through career."  *Id.*, Exh. C.[2]  In particular, the ACT assessment purports to provide an indicator of college readiness.  OVC, at ¶ 19.

The benefits of scoring well on the ACT exam are not limited to enhanced opportunity for admission to a chosen university or college.  OVC, at ¶ 20.  As the ACT itself asserts on its website, not only can taking the ACT examination "[i]ncrease your chances for getting into the college of your choice" (*id.*, Exh. C)[3] but it can "increase your chances of earning new or better

---

[1] ACT was originally an acronym for American College Testing.
[2] *See* www.act.org (last reviewed on July 5, 2022).
[3] *See* www.act.org (last reviewed on July 5, 2022).

scholarships" and be used by colleges and universities "to place you in the right classes at the right level" (OVC, at ¶ 20; Exh. D).[4]

The ACT assessment is administered within the United States on seven test dates each year in September, October, December, February, April, June and July.  OVC, at ¶ 21.

Pierson seeks to take the ACT exam as part of his effort to obtain early admission into his chosen colleges and universities.  OVC, at ¶ 22.  In light of his disabilities, Pierson has requested reasonable accommodations with respect to certain aspects of the ACT testing process.  *Id.* Specifically, Pierson has requested preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).  *Id.*  These accommodations are required for Pierson to have a fair and equal opportunity to obtain a score on the test that reflects his actual abilities—a reasonable goal in that it is precisely the purpose of such a standardized test to measure such abilities in a fair and equal manner.  *Id.*

However, the ACT has denied Pierson's request for these accommodations.  OVC, at ¶ 23.  Initially, the ACT denied Pierson's request on April 5, 2022.  *Id.*, April 5, 2022 Letter from ACT, Inc. ("April 5 Denial," attached as Exh. E).  Rather than providing any grounds for such denial specifically tailored to Pierson's factual circumstances, the ACT merely provided generic justifications for the denial that did not provide Pierson with sufficient wherewithal with which to ascertain the specific factual bases for the denial.  OVC, at ¶ 23; April 5 Denial.  For example, the denial stated as follows: "The request indicates that you did not receive this diagnosis until recently, and/or your documentation does not support a history of difficulties associated with this diagnosis."  OVC, at ¶ 23; April 5 Denial, at 1.  This basis for the denial, restated in other variations elsewhere in the correspondence, made little sense to Pierson and his

---

[4] *See* www.act.org/content/act/en/reasons-to-take-the-act.html (last reviewed on July 5, 2022).

family as they had already provided the report from the licensed psychologist that explained the impact of Pierson's four concussions on the symptomatology associated with his attention and processing disorders.  OVC, at ¶ 23.  Moreover, nothing in the ADA requires a lengthy "history of difficulties associated with [a particular] diagnosis."[5]  *Id.*  Likewise, the ADA requires that reports of those who have personally evaluated an applicant take precedence over the views of reviewers who have not.  *See* 28 C.F.R. pt. 36, app. A, at 796.  OVC, at ¶ 23.  In this case, the report of the licensed psychologist was completely uncontroverted.  *Id.*, April 5 Denial.  Furthermore, the College Board, another private entity that develops and administers the Scholastic Aptitude Test (the "SAT") had no difficulty in granting Pierson's requested accommodations as both reasonable and appropriate.  OVC, at ¶ 23; Exh. F.  Nevertheless, they submitted further information to the ACT to show the need for these accommodations, including correspondence from Pierson's board-certified pediatrician.  OVC, at ¶ 23; April 26, 2022 Letter from Dr. Rebecca D. Butler ("Butler Letter," attached as Exh. G).  The pediatrician further explained the impact of Pierson's four concussions, which resulted in episodes of extreme confusion and incoherence.  OVC, at ¶ 23; Butler Letter.  Based on her own work with Pierson, neurocognitive assessments, and her review of the testing done by the licensed psychologist in January 2022, the pediatrician concurred with the recommendations made by the licensed psychologist, including that Pierson have preferential seating and extended time on standardized testing administrations.  OVC, at ¶ 23; Butler Letter.

---

[5] *See, e.g.*, Final Report of the Best Practices Panel (the "Final Panel Report," attached as Exh. L), established through Consent Decree in *The Department of Fair Employment and Housing v. Law School Admission Council, Inc.*, Case No. 3:12-cv-01830-JCS (N.D. Cal.), Dkt. No. 209-1, upheld in relevant part by 2015 U.S. Dist. LEXIS 104751 (N.D. Cal. Aug. 7, 2015).  In particular, *see* Final Panel Report at 14 ("Reviewers shall not presume that a candidate does not have a disability when there is no history of a disability or record of use of testing accommodations.  A variety of factors can delay the identification of a disability . . . .")

Nevertheless, the ACT denied Pierson's requested accommodations once more in correspondence dated May 9, 2022.  OVC,  at ¶ 24; May 9, 2022 Letter from ACT, Inc. ("May 9 Denial," attached as Exh. H).  Some of the bases for the denial put forward were so non-specific as to make it impossible to determine how they applied to Pierson, if at all.  OVC, at ¶ 24; May 9 Denial.  For example, the denial letter asserted such platitudes as: "ACT provides testing accommodations in accordance with the Americans with Disabilities Act (ADA).  The purpose of accommodations is to promote equal access for an individual with a disability."  OVC, at ¶ 24; May 9 Denial, at 1.  Likewise, the letter stated: "Accommodations are outcome neutral—that is, they are not intended to provide an advantage."  OVC, at ¶ 24; May 9 Denial, at 1.  These kinds of assertions provided no information to Pierson as to the basis for the denial of his requests. OVC, at ¶ 24.

The only substantive explanation for the denial, other than a reiteration of the mysterious assertion that Pierson needed to show the same educational impact over a more extended period of time to demonstrate his disability for purposes of the ADA, was as follows:

> The requested accommodation is not approved because:
> - A difference between intelligence and achievement, on its own, does not indicate a disability under the Americans with Disabilities Act (ADA).
>   - By 2017, it had been well-known for many years that the diagnosis of (learning) disability based on discrepancy analysis (aptitude-aptitude and aptitude-achievement) is invalid.
>   - It is not uncommon for individuals to display differences between their highest and lowest scores.
> - Scores falling within or above the average range, no matter how discrepant from your IQ, do not satisfy ADA requirements for a disability, which are referenced to the functioning of most people in the general population.
> - While the submitted evaluation suggests discrepancies between your cognitive and achievement skills, your achievement was within or above the average range for your age.
> - Objective evidence which shows functioning in a major life activity (e.g., reading, thinking, concentrating) below the average person may provide additional support for this request.

5

OVC, at ¶ 25; May 9 Denial, at 1.

As an initial matter, this assertion does not explain precisely what the ACT found lacking in Pierson's documentation.  OVC, at ¶ 25.  After all, as noted above, Pierson had already provided substantial documentation as to the impact of the four concussions on his disability manifestations, rendering them considerably more acute in recent years.  *Id*.  Furthermore, he nowhere relied exclusively on the discrepancy between cognitive and achievement skills as the basis for his request for a reasonable accommodation.  *Id*.  Rather, his evaluators pointed to such discrepancies by way of confirmation of and evidence for the disabilities underlying that request. *Id*.  Finally, this basis for the denial by the ACT implies that an applicant can show a disability only if the testing scores relied on as evidence for that disability fall below the scores achieved by the average test-taker.  *Id*.  However, this approach fails for at least two reasons.  *Id*.  First, it discriminates against the highly intelligent applicant with a disability who can overcome the effects of that disability sufficiently to score higher than the average test-taker, but not in such a manner as to achieve the scores that he or she would have achieved in the absence of the disability.  *Id*.  Second, it tends to predetermine the effective scoring range of the applicants at issue.  *Id*.  Those who receive accommodations are only those who would otherwise score below average and thus, by extension, would presumably receive accommodations only to the extent those accommodations are needed to push them just into the average range.  *Id*.  Those who would not otherwise score below average will receive no accommodations and will thus score in a range determined not just by aptitude, but by the disability or disabilities as well.  *Id*.  Far from providing applicants with disabilities an equal playing field, such an approach willfully refuses to address the impact of the disability on an affected applicant's performance.  *Id*.

Pierson himself has the intellectual aptitude to achieve scores on standardized examinations that exceed those of the average population, despite his multiple disabilities. OVC, at ¶ 26. *See also generally* Elliott Report. However, his disabilities prevent him from achieving scores on standardized examinations that reflect his actual aptitude, which is precisely what standardized tests are intended to measure. OVC, at ¶ 26. *See also generally* Elliott Report. Pierson's attention and processing deficits were explained and evidenced in his evaluations both independently of testing and as factors that brought down his composite testing scores. OVC, at ¶ 26. *See also generally* Elliott Report, Butler Letter. Both the attention and processing deficits substantially limit Pierson's ability to learn, to concentrate, and to think relative to the general population, but are often masked by his superior abilities in other aspects. OVC, at ¶ 26; Elliott Report.

In response to the second denial from ACT, Pierson and his family sent further information explaining his disabilities that further demonstrated that such disabilities were not evidenced merely by discrepancies between tested intelligence and achievement. OVC, at ¶ 27; Exh. I. The documentation showed that, while practice helped Pierson improve his testing accuracy, it did not help him improve his processing time, thus providing evidence that the processing difficulties arose from Pierson's disability. OVC, at ¶ 27; Exh. I. The documentation also included correspondence from Pierson's attorney, explaining the relevant law and its application to the above-described facts. OVC, at ¶ 27; Exh. J. Nevertheless, ACT denied the accommodation requests a third time. OVC, at ¶ 27; June 24, 2022 Letter from ACT, Inc. ("June 24 Denial," attached as Exh. K).

ACT offers its last testing administration date for the summer of 2022 on July 16, 2022. OVC, at ¶ 28. Pierson has registered for this July 2022 testing administration, but he requires the

reasonable accommodations he requests to have a fair and equal chance at a score on the ACT exam that reflects his actual abilities relative to his peers.  *Id*.  As explained above, ACT continues to deny his request.  *Id*.

Without the appropriate accommodations, Pierson will lack a fair and equal opportunity to show his aptitude and skill levels on the ACT and will thus lack a fair and equal opportunity to compete for early admission into, to receive scholarships and other benefits from, and to obtain proper placement considerations at his chosen colleges and universities.  OVC, at ¶ 29.  As colleges and universities often serve as gatekeepers for future careers and life-trajectories, Pierson thus faces the prospect of irreparable harm—harm exacerbated by the fact that it arises from forms of disability discrimination recognized by Congress in the civil rights statutes as "continu[ing] to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).  *Id*.

In light of the continued wrongful conduct of Defendant ACT, Pierson seeks injunctive relief in the form of a temporary restraining order, a preliminary injunction, and finally a permanent injunction to prevent Defendant ACT from wrongfully continuing to deny him the reasonable accommodations he seeks in the form of preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).  OVC, at ¶ 30.

## II.    ARGUMENT

To prevail in a motion for a temporary restraining order ("TRO") or a preliminary injunction, Plaintiff must show (1) a substantial likelihood that he will prevail on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm to Defendant; and (4) that the granting of the preliminary injunction will not disserve the public interest.  *See Janvey v, Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (preliminary injunction); *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th

Cir. 1991) (same); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (preliminary injunction or temporary restraining order).

Plaintiff need not necessarily satisfy each of these factors to the same degree.  Rather, a court must use a balancing-type approach in reviewing a preliminary injunction or TRO application.  *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).  When analyzing the degree of "success on the merits" necessary to justify injunctive relief, the Fifth Circuit employs a sliding scale that involves balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits.  *See Productos Carnic S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).  Indeed, a showing of even some likelihood of success will justify preliminary injunctive relief.  *See, e.g.*, *Jefferson Community Health Care Centers, Incorporated, v. Jefferson Parish Gov't*, 849 F.3d 615, 626 (5th Cir. 2017) ("Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements."); *Association of Taxicab Operators, USA v. City of Dallas*, 760 F. Supp. 693, 696 (N.D. Tex. 2010) ("Even some likelihood of success can be enough to support the issuance of a preliminary injunction.").  In this case, Plaintiff has met all the factors necessary for this Court to issue a temporary restraining order and then a preliminary injunction.

**A.**     **There Is a Substantial Likelihood That Plaintiff Will Prevail on the Merits.**

   **1.**     **There Is a Substantial Likelihood That Plaintiff Will Prevail on His ADA Claims.**

Title III of the ADA deems discriminatory "a failure to make reasonable modifications to policies, practices, and procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities,

unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]" 42 U.S.C. § 12182(b)(2)(A)(ii).  The ADA expressly makes this reasonable accommodation requirement applicable to testing organizations, such as ACT, mandating that "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.  Moreover, the regulations promulgated by the Department of Justice prohibit Defendant from administering the ACT examination without ensuring that the scores reported "accurately reflect the applicant's aptitude or achievement level or whatever other factor the test purports to measure, rather than reflecting the applicant's [disability]." 28 C.F.R. § 36.309(b)(1)(i).  Pierson is an individual with disability.  He requires reasonable testing accommodations to have a fair and equal opportunity to demonstrate his aptitude and skills on the ACT examination.  Granting his request for such accommodations would not fundamentally alter any aspect of ACT's provision of that examination.

### a.      Pierson Is an Individual with a Disability.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).  A physical or mental impairment is, in relevant part, "[a]ny mental or psychological disorder, such as intellectual disability . . ., organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).  Major life activities, in turn, "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The "term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).

As explained in Section I above, Pierson has mental impairments in the form of attention deficit disorders, processing difficulties, and specific learning disorders.  These impairments substantially limit his ability to learn, to concentrate, and to think, among other things.  Dr. Lisa M. Elliott, the licensed psychologist who tested Pierson and drafted his psychoeducational report (Exh. B) specifically cites both testing and anecdotal evidence in this regard.  *See, e.g.*, Elliott Report, at 4.  For example, Pierson fell into the Below Average range with respect to Oral Reading Fluency due to his visual processing deficits.  Elliott Report, at 3.  The visual processing deficits, particularly when coupled with his concentration difficulties, placed substantial limits on Pierson's performance relative to the general population, despite the fact that he does not have a learning disability in reading separate and apart from the above-referenced deficits and difficulties.  *See, e.g.*, 29 U.S.C. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.")  This standard is not meant to be demanding (29 C.F.R. § 1630.2(j)(1)(i)) and "should not demand extensive analysis" (29 C.F.R. § 1630.2(j)(1)(iii)) in its application.  Pierson has met that standard.

### b.  Pierson Requires Reasonable Accommodations.

As a general matter, the ADA requires "reasonable accommodations for persons with disabilities, to provide them 'an even playing field' . . . ."  *Bedford v. Michigan*, 722 Fed. Appx. 515, 519 (6th Cir. 2018).  As the ACT itself admits in its May 9 Denial, the "purpose of

accommodations is to promote equal access for an individual with a disability."  In this case, as evidenced by the uncontroverted Elliott Report and the supporting Butler Letter, Pierson requires the reasonable accommodations of preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).  Defendant has failed to provide any countervailing evidence to dispute the Elliott Report and Butler Letter, but has merely sought to impose an excessive burden of proof on Plaintiff.  As explained below, the specific bases for denial offered by Defendant lack merit under applicable law.

> **c.    Defendant's Purported Bases for Denying Plaintiff the Accommodations He Requests Lack Merit.**

Despite offering no evidence to controvert the Elliott Report, the Butler Letter, or any other documentation provided by Plaintiff, Defendant ACT nevertheless denied his request for reasonable accommodations.  The purported bases for these denials lack merit.

First, in the April 5 Denial, ACT stated in formulaic fashion that Plaintiff "did not receive [his] diagnosis until recently, and/or [his] documentation does not support a history of difficulties associated with [his] diagnosis."  Then, elsewhere in the April 5 Denial and again in its successor denials, ACT repeated the same mantra with slight variations in phrasing.  Regardless of phrasing, this basis for denial is illegitimate.  As discussed in Section I above, nothing in the ADA requires that an applicant for a reasonable accommodation on an examination show a long history of difficulties.  *See, e.g.*, Final Panel Report (Exh. L), at 14 ("Reviewers shall not presume that a candidate does not have a disability when there is no history of a disability or record of use of testing accommodations.")  After all, as with Pierson himself with his four recent concussions which greatly exacerbated his neurological impairments, an individual could have an onset or significant increase in difficulties not long before an examination.  The approach adopted by the ACT would preclude the grant of accommodations to such individuals.

In fact, the structure of the ADA itself militates against the ACT's approach.  As explained in Section II.A.1.a above, one of the three ways a person can qualify as an individual with a disability is by showing a record of impairment.  An individual has a record of impairment "if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k)(1).  If an individual could show disability only by showing such a history, then showing a record of impairment would not constitute one of three ways to show disability.  It would constitute the only way.

Likewise, as discussed in Section I above, the purported basis for denial by Defendant ACT based on Plaintiff's ability to score in the average range or above relative to the general population is equally meritless.  Plaintiff has not relied for evidence of his disability merely on a comparison between his intelligence and his achievement, as suggested by Defendant ACT in its May 9 Denial, at 1.  On the contrary, the Elliott Report explained Plaintiff's deficits in attention, concentration, visual processing, auditory processing, and working memory, among other things.  The Elliott Report demonstrated these deficits and their impact not only through test results, but also through anecdotal evidence and behavioral observations.  *See, e.g.*, Elliott Report, at 4.  The ADA Guidance promulgated by the Department of Justice provides that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."  28 C.F.R. pt. 36, app. A, at 796.  Consequently, it is illegitimate for Defendant ACT simply to disregard the Elliott Report and the supporting Butler Letter without any evidence to controvert those documents.  To the extent that Defendant ACT disregarded these documents because they did not show below

13

average testing scores in areas other than in Oral Reading Fluency (Elliott Report, at 3),[6] it based its approach on a misunderstanding of applicable law.  It is not required that an applicant show below average performance on tests relative to the general population to evidence a disability or a need for reasonable accommodations.  Rather, as the ADA itself requires, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as— . . . learned behavioral or adaptive neurological modifications."  42 U.S.C. § 12102(4)(E)(i) & (i)(IV).  Such learned behavioral or adaptive neurological modifications can include the use of one set of abilities to overcome weaknesses in another.  Thus, "as Congress emphasized in passing the ADA Amendments Act, '[w]hen considering the condition, manner, or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who has performed well academically cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking.'  154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers)."  Final Panel Report, at 13.  Here, the Elliott Report demonstrates Plaintiff's deficits in attention, concentration, and processing (*see, e.g.*, Elliott Report, at 3-4)—deficits which impose substantial limitations on Plaintiff's ability to learn, to concentrate, and to think, among other things, despite the fact that he can use his other stronger neurological abilities to compensate and to achieve average or above-average testing scores.  As explained in Section I above, to insist that no applicant receive accommodations unless that applicant would achieve below-average testing scores without the accommodations is to

---

[6] That Defendant ACT may have followed this line of thinking is suggested by the otherwise unintelligible ground for denial in the April 5 Denial that "[t]he ACT is not a test of oral reading; therefore, accommodations on the ACT are not required."  Plaintiff had requested no accommodations related to oral reading.

misunderstand the statutory mandate.  It is also to violate that mandate and its implementing regulations which prohibit Defendant from administering the ACT examination without ensuring that the scores reported "accurately reflect the applicant's aptitude or achievement level or whatever other factor the test purports to measure, rather than reflecting the applicant's [disability]."  28 C.F.R. § 36.309(b)(1)(i).  Plaintiff cannot show his actual aptitude on the ACT examination without the reasonable accommodations he requests.  The Elliott Report and the supporting Butler Letter establish that point, and those documents are uncontroverted.

### d.    Plaintiff's Requested Accommodations Would Not Fundamentally Alter Any Aspect of the ACT Testing Administration.

Plaintiff requests as reasonable accommodations preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).  Neither of these accommodations would fundamentally alter any aspect of the ACT testing administration.  As an initial matter, none of the denials issued by Defendant ACT suggest the threat of any such fundamental alteration.  Moreover, such accommodations are commonly requested and granted by individuals with disabilities with respect to examination administrations and are not generally considered to require burdensome proof.  *See, e.g.*, Final Panel Report, at 5-7.  *See also, e.g.*, *id.*, at 17 ("It is the Panel's recommendation that individuals with an established diagnosis of ADHD shall be given a minimum of 50% additional time.")  They are not viewed as fundamentally altering any aspect of the relevant examinations.  *See, e.g.*, *id*.

### e.    Defendant ACT Failed To Engage in the Required Interactive Process.

Despite issuing denial after denial, Defendant ACT did not engage appropriately in the prescribed interactive process in addressing Plaintiff's request for a reasonable accommodation.  *See, e.g.*, *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) ("Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and

both parties have a duty to participate in good faith.") (citations omitted).  *See also, e.g.*, *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111-2 (9th Cir. 2000) (en banc) (applying the interactive process requirement in a Title III case), *rev'd on other grounds*, 535 U.S. 391 (2002).  Here, Plaintiff's pediatrician for the past six years made good faith responses to the ACT's inquiries in its April 5 Denial regarding Plaintiff's circumstances, despite the fact that the ACT gave no clear or coherent account in that denial as to what it found lacking in the original documentation.  In its subsequent May 9 Denial, the ACT did not specify any explanation offered by the pediatrician that it found lacking in any way or for which it required supplementation.  Instead, the ACT simply continued its denial based on ostensibly the same grounds—the fact that Plaintiff had not always shown precisely the same level of difficulty—*i.e.*, had not shown "pervasive academic or real-world difficulties over time."  Defendant ACT thus made no good faith attempt to explain any legitimate bases for its repeated denials or to provide Plaintiff a mechanism to address any such bases.  It failed to engage in a legitimate interactive process.

> **2.      There Is a Substantial Likelihood That Plaintiff Will Prevail on His Section 504 Claims.**

Plaintiff will likely prevail on his Section 504 claims for precisely the same reasons that he will likely prevail on his ADA claims.  With respect to the analysis of reasonable accommodations, courts treat the ADA and Section 504 in the same manner.  *See, e.g.*, *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) ("The language of the ADA generally tracks the language set forth in the [Rehabilitation Act]," and "[j]urisprudence interpreting either section is applicable to both.")

**B.      There Is a Substantial Threat That Plaintiff Will Suffer Immediate Irreparable Injury If the Injunction Is Not Granted.**

Plaintiff will suffer irreparable injury if the injunctive relief he seeks is not granted.  As discussed in Section I above, Plaintiff seeks early admission into his preferred colleges and

universities.  The *2019 State of College Admission* guidebook published by the National Association for College Admission Counseling ("NACAC Guide," attached as Exh. M),[7] at 10, found that "[a]s expected, colleges with Early Decision policies reported a higher acceptance rate for their ED applicants as compared to all applicants (61 percent versus 49 percent)."  *See also* NACAC Guide, at 12 (Table 5).  Notably, the NACAC Guide also found that 82.8 percent of colleges attributed either considerable or moderate importance to Admission Test Scores (SAT, ACT) in admission decisions for first-time freshmen.  NACAC Guide, at 15 (Table 7).  These statistics demonstrate that having a fair and equal opportunity to demonstrate his aptitude on the ACT examination is of critical importance to Plaintiff having a fair and equal opportunity for admission to the colleges and universities of his choice.  He would be irreparably harmed if denied that fair and equal opportunity.

Furthermore, irreparable harm is presumed from the statutory violations Plaintiff has shown.  Title III of the ADA authorizes the same remedies for its violation as are available under 42 U.S.C. 2000a-3(a).  42 U.S.C. § 12188.  Injunctive relief is expressly authorized under 42 U.S.C. 2000a-3(a).  Irreparable harm may thus be presumed.  *See, e.g.*, *United States v. McMillan*, 946 F. Supp. 1254, 1268 (S.D. Miss. 1995) ("[W]here preliminary injunctive relief is expressly authorized by a civil rights statute, irreparable harm is presumed from the very fact that the statute has been violated.") (citing cases); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 2011 U.S. Dist. LEXIS 157604, *7 (E.D. La. March 4, 2011) ("The Fifth Circuit has held that when a statute authorizes the granting of injunctions, then the violation of the statute supports the presumption of irreparable injury.") (citing cases).

---

[7] Available at https://www.nacacnet.org/globalassets/documents/publications/research/2018_soca/soca2019_all.pdf (last reviewed on July 5, 2022).

Plaintiff will thus suffer immediate and irreparable injury if Plaintiff's requested injunction is not granted.

**C.      The Threatened Harm to Plaintiff Outweighs the Threatened Harm the Injunction May Cause Defendant ACT.**

The requested injunction will not harm Defendant ACT at all, such that the irreparable harm that will befall Plaintiff necessarily carries greater weight.

Granting the requested injunction can cause Defendant ACT no harm.  After all, as discussed in Section II.A.1.d above, the accommodations Plaintiff requests would cause no fundamental alteration to the testing services ACT provides.  In fact, these accommodations are commonly requested.  In this case, the grant of the accommodations is the only mechanism available to accomplish their purpose, as acknowledged by ACT itself—"to promote equal access for an individual with a disability."  May 9 Denial.  Grant of the accommodations is also the only mechanism that will follow the regulatory mandate of ensuring that the ACT reports scores that "accurately reflect the applicant's aptitude or achievement level or whatever other factor the test purports to measure, rather than reflecting the applicant's [disability]."  28 C.F.R. § 36.309(b)(1)(i).  It cannot harm Defendant ACT to comply with the regulatory mandate.

The threat of harm to Plaintiff from the denial of the injunctive relief thus outweighs any conceivable burden to Defendant that its grant could cause.

**D.      The Granting of a Preliminary Injunction Will Not Disserve the Public Interest.**

Granting preliminary injunctive relief and a temporary restraining order requiring Defendant ACT to cease its discriminatory conduct would have no detrimental effect on the public.  After all, it is in the public interest to end the historically pervasive discrimination against the disabled, as Congress understood in enacting the Americans with Disabilities Act. *See, e.g.*, 42 U.S.C. § 12101(3) ("[D]iscrimination against individuals with disabilities persists in

18

such critical areas as . . . education . . . .")  Furthermore, courts have held that "the public interest is served whenever state and federal laws are enforced."  *See, e.g.*, *Blue Bell Creameries, L.P. v. Denali Co., LLC*, 2008 WL 2965655, *7 (S.D. Tex. July 31, 2008) (citing cases).  This is particularly true with respect to enforcement of civil rights statutes.  *See, e.g.*, *Enyart v. National Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) ("In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities."); *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) ("Finally, on the public interest factor, the Supreme Court has found the FHA serves an 'overriding social priority.'") (quoting *Meyer v. Holley*, 537 U.S. 280, 290 (2003)).  The granting of a TRO and preliminary injunction will not disserve the public interest.

## IV.   CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that this Court enter a temporary restraining order and preliminary injunction enjoining Defendant MBP Barcelona, LLC, and any and all of MBP's officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, from wrongfully continuing to deny him the reasonable accommodations he seeks in the form of preferential seating and an increase in the testing time allotted by a factor of fifty percent (time and one half).

DATED: July 7, 2022

Respectfully submitted,

s/ Mark Whitburn
Mark Whitburn
Texas Bar No. 24042144
Sean Pevsner
Texas Bar No. 24079130
Whitburn & Pevsner, PLLC
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (817) 653-4547
Fax: (817) 653-4477
mwhitburn@whitburnpevsner.com

Attorneys for Plaintiffs

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 6, 2022, I sent a draft version of the foregoing Motion with Exhibits B-M, along with a draft version of Plaintiff's Original Verified Complaint to the following email addresses to which I was directed by an employee of Defendant ACT, Inc.: actaccom@act.org and act-cares@act.org.  The employee of Defendant ACT, Inc., directed me to those email addresses after I requested information as to whether ACT, Inc., had a legal department and, if not, to whom I should direct notice of an impending lawsuit coupled with a request for injunctive relief regarding a denial of accommodations.  I received no response from either of those email addresses.  I sent the final versions of Plaintiff's Original Verified Complaint and the foregoing Motion with all exhibits to those same email addresses on July 7, 2022.

s/ Mark Whitburn
Mark Whitburn

**CERTIFICATE OF SERVICE**

I hereby certify that, as noted in the Certificate of Conference above, I send a true and correct copy of the foregoing Motion and its exhibits, along with Plaintiff's Original Verified Complaint, on July 7, 2022, to the email addresses to which I was directed by an ACT, Inc., employee with whom I spoke telephonically.  I will also serve a true and correct copy of the foregoing Motion and its exhibits as part of service of process along with summons and initiating pleadings.


s/ Mark Whitburn
Mark Whitburn

21