# EXHIBIT L

# Final Report of the "Best Practices" Panel

## January 26, 2015

**Ruth Colker, J.D.**
**Heck-Faust Memorial Chair in Constitutional Law and Distinguished University Professor, Moritz College of Law, The Ohio State University**

**Charles Golden, Ph.D.**
**Professor, Center for Psychological Studies, Nova Southeastern University**

**Shelby Keiser, M.S.[1]**
**President, Keiser Consulting, LLC**

**Nancy Mather, Ph.D.**
**Professor, Department of Disability and Psychoeducational Studies, College of Education, University of Arizona**

**Nicole Ofiesh, Ph. D.**
**Nicole Ofiesh, Ph.D., LLC; Sr. Research Associate, Schwab Learning Center, Stanford University**

On May 29, 2014, Judge Edward M. Chen approved the Consent Decree between the California Department of Fair Employment and Housing ("DFEH"), the United States of America and the Law School Admission Council, Inc. ("LSAC"), Case No. CV 12-1830-EMC. The Consent Decree resolves lawsuits filed by DFEH and the United States of America alleging that LSAC discriminated against individuals with disabilities who take, or seek to take, the Law School Admission Test ("LSAT") with testing accommodations, in violation of the Americans with Disabilities Act ("ADA"). Among other requirements, the Consent Decree provides that "LSAC shall implement best practices as established by a panel of experts to be agreed upon by the parties." (Consent Decree (ECF 203), ¶ 7). It charges the panel with examining LSAC's existing testing accommodation practices and establishing best practices that comport with the requirements of the ADA. (*Id.* at ¶ 7(b)-(c)). The Consent Decree also provides that the "Panel shall complete its written report within six (6) months after the fifth Panel member has been appointed" but could seek "additional time if necessary to complete its report." (*Id.* at ¶ 7(d)). The fifth Panel member was appointed on June 25, 2014.

As required by the Consent Decree, the Panel provided the Parties with an opportunity to present their views at a meeting held on August 7, 2014. The Panel also set benchmarks at our meeting held on August 11, 2014. In accordance with those benchmarks, the Panel requested, and the parties approved, an extension of the submission of the final written report to January 31, 2015.

---

[1] A Minority Report by Shelby Keiser is attached as a separate document.

The Consent Decree states that the Panel shall "give each of the Parties an opportunity to comment in writing on the Panel's draft Best Practices at least two (2) weeks prior to the issuance of a final report." (Consent Decree, ¶ 7(d)). The Panel shared a draft report with the Parties on December 12, 2014 and provided them until January 8, 2015 to provide feedback. The Panel revised the report after reviewing comments from both parties.

The Consent Decree provides: "The Panel shall determine how many of the five Panel members must agree on each Best Practice in order for it to be imposed as a Best Practice." (Consent Decree, ¶ 7(b)) The Panel agreed to try to attain consensus, where possible, and, if consensus could not be attained, to seek agreement from at least four Panel members. All of the recommendations contained in this report under the heading "Resolution of the Ten Issues by the Best Practices Panel" have been approved by at least four Panel members and are "Best Practices," as defined in the Consent Decree. LSAC must implement each of them.

The Consent Decree specifies ten issues for the Panel to resolve and states: "the Panel shall clearly and expressly state in writing whether each Best Practice is already being followed by LSAC or needs to be implemented by LSAC." (Consent Decree, ¶ 7(b)). This Report reflects the Panel's recommendations with respect to the ten issues that we were charged to address. For each issue, we first describe LSAC's current practice. These descriptions are based on our review of LSAC's written submission to the Panel, the written material that they provide to candidates on their website, and the Panel's interviews with LSAC staff. In addition, we reviewed information that we gathered from involved parties and other testing entities. Following our description of LSAC's current practices, we make recommendations that, under the terms of the Consent Decree, are binding on LSAC.

During preparation of this Report, the Panel complied with the Consent Decree's requirements regarding ex parte communications. The Consent Decree provides that the Panel may engage in "ex parte communications" but that "Individual Panel members shall not engage in any ex parte communications without the knowledge and approval of all other Panel members." (Consent Decree, ¶ 7(e)). Finally, the Consent decree provides: "The Panel shall disclose to the Parties prior to the issuance of its final report all individuals with whom the Panel or any of its members have communicated, the Panel members participating in the communication(s), and the date(s) of such communication(s), but it need not disclose the substance of such communication(s)." (*Id.*) All Panel members approved each ex parte communication. The Panel complied with the ex parte communication recording-keeping requirement. The Panel provided a draft ex parte communication log to the Parties on January 13, 2015 and revised it in light of the Parties' corrections. The final ex parte communication log is attached to this document

The Panel has developed these recommendations with the hope that the implementation of these recommendations will exceed the lifetime of this Consent Decree. The Panel respectfully requests that LSAC allows us to meet with the LSAC Board, or a committee of the Board, to present these Best Practices so that the Board will understand why the Panel believes that LSAC should immediately implement these recommendations,

why these recommendations should survive the duration of the Consent Decree, and how these recommendations can facilitate a climate change within LSAC to be more supportive of the rights of candidates with disabilities.

## Resolution of the Ten Issues by the Best Practices Panel

1. **Diversification.** The Panel shall provide LSAC with recommendations on how to diversify its expert consultants, in terms of numbers and areas of expertise, which LSAC shall implement.

### Current Practice

LSAC relies on expert consultants on what it describes as a "periodic" basis. In recent years, it has relied on two outside consultants– one clinical psychologist and one ophthalmologist.

### Panel's Recommendation

In response to Issue 3, the Panel has set forth criteria that LSAC shall use to retain reviewers, including outside consultants.

In response to Issue 8, the Panel recommends an automatic review by one or two outside consultants of all applications for testing accommodation requests that are not approved in full by LSAC. Based on the data provided to the Panel by LSAC, we believe that LSAC may need to send approximately 300 files to outside consultants if it continues its current rate of not fully approving testing accommodation requests during each testing cycle. It appears that the following figures reflect the percentage of applications for testing accommodations received for the various disability categories: ADHD (32 %), LD (23 %), neurological (11 %), visual (10 %), physical (10 %), psychological (7 %), hearing (1 %), and other/medical (6 %), with some candidates having more than one of these physical or mental impairments.

In light of the anticipated number of applications for testing accommodations, and the likely rate of denial for these groups, we recommend that LSAC have a list of 25-40 outside consultants. As a whole, these outside reviewers would have expertise in each of these areas and would be available to provide a timely review of testing accommodation requests. In making this recommendation, we reviewed the practices of other testing entities, which have an equivalent list of outside reviewers. These entities maintain the list with a designation by each reviewer of his or her various areas of expertise. It is expected, based on our review of other testing entities' practices, that many of the reviewers retained by other testing entities would be well qualified to review many different types of requests for testing accommodations.

2. **Documentation.** The Panel shall consider and establish the type and scope of appropriate documentation that may be requested from candidates whose requests fall under Paragraphs 5(b)-(d) [of the Consent Decree]. The Panel shall include in its

consideration the documentation requirements for candidates who have received some of their requested testing accommodations for a standardized examination related to applications for post-secondary admission but who request additional testing accommodations, or in excess of double time, for the LSAT, consistent with the terms of Paragraph 5(b) [of the Consent Decree].

**Current Practice**

LSAC has documentation guidelines for each major disability category on its website.  These guidelines seek to establish that an individual has: (1) been diagnosed with a mental or physical impairment; (2) is substantially limited, compared to most people, in a major life activity relevant to taking the LSAT as a result of this physical or mental impairment; and (3) requires testing accommodations to address his or her specific functional limitations (with a rationale and objective basis for the testing accommodations requested).

**Panel's Recommendation**

The Panel believes that LSAC's documentation requirements are excessive for most candidates who seek testing accommodations on the LSAT and inconsistent with the documentation guidelines of other national testing entities.  For example, LSAC has lengthy documentation requirements for candidates who have a learning disability and seek extra time as an accommodation.[2]  These documentation requirements specify certain diagnostic tests that a professional should administer to support a request for testing accommodations.  By contrast, other testing entities, such as ACT, provide general guidelines, which are consistent with professionally recognized criteria, without specifying discrete test instruments.[3] It is the expectation of the Panel that qualified professionals who provide documentation consistent with our Best Practices will use such criteria as a basis for their recommendation.  There is no need for the Panel to be specific beyond that requirement because the qualified professional is typically the person in the best position to determine which diagnostic instruments are appropriate for a particular individual.

By lessening the documentation requirements and implementing minimum standards for granting testing accommodation requests, as stated in response to Issue 5, LSAC staff can approve requests for testing accommodations on a more streamlined basis. As discussed below, the Panel recommends that close investigation of a testing accommodation request need only take place for those candidates who fall into what the Panel describes as "category 3" (i.e., candidate without a visual impairment who requests more than 50% extra time, or candidate with a visual impairment who requests more than 100% extra time). This streamlined process is consistent with the ADA's requirement that "the question of whether an individual's impairment is a disability under the ADA should

---

[2] See http://www.lsac.org/docs/default-source/jd-docs/guidelinescognitive-non.pdf.
[3] See http://www.act.org/aap/pdf/ACT-Policy-for-Documentation.pdf.

not demand extensive analysis."[4]

Further, the Panel believes that LSAC's use of the "compared to most people" rule has resulted in insufficient attention to the "condition, manner, or duration" under which a candidate completes a major life activity. Assessing the condition, manner, or duration under which a major life activity can be performed may include consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. (See 29 C.F.R. § 1630.2(j)(4)(i) and (ii)). As discussed in response to Issue 8, the Panel believes that it is important for individuals who have average overall reading abilities to be eligible to receive **testing** accommodations on the LSAT without excessive documentation requirements if, for example, the manner in which they read is impaired as compared to the general population, thus qualifying them for coverage under the ADA as individuals with a disability.

The Panel recommends that the required level of documentation shall depend upon the nature of the request for testing accommodations from the candidate. The Panel has found that LSAC frequently denies requests for testing accommodations because it considers documentation to be incomplete. The Panel recommends that LSAC shall consider a file to be complete if it meets the documentation requirements of at least one of the categories noted below, although a candidate may seek testing accommodations under more than one of these categories. LSAC will need to revise its documentation forms to comply with these recommendations.

The Panel has divided testing accommodation requests into three categories:[5]

(1) candidate has a disability and requests a testing accommodation that does not modify the amount of time permitted to respond to the questions in each test section, such as permission to bring in food, take stop-the-clock breaks, have additional breaks between sections, or take the exam in a quiet area;

(2) candidate does not have a visual impairment and requests up to 50% extra time, or candidate has a visual impairment and requests up to 100% extra time;

(3) candidate does not have a visual impairment and requests more than 50% extra time, or candidate has a visual impairment and requests more than 100% extra time.

---

[4] It is also consistent with how other testing entities evaluate requests for testing accommodations. See, e.g., http://www.act.org/aap/pdf/ACT-TestAccommodationsChart.pdf.

[5] Dividing requests into these kinds of categories based on the nature of the accommodation requested by the candidate is consistent with the practice of other national testing entities. See, e.g., http://www.actstudent.org/regist/disab/; https://www.ets.org/disabilities/test_takers/request_accommodations/.

Category (1): Candidates should comply with these documentation requirements to request testing accommodations other than extra time. These requests may be made in addition to requests for extra time. If the candidate requests extra time then the candidate must comply with the documentation requirements for categories (2) or (3).

(a) Examples include, but are not limited to:
- assignment to a wheelchair-accessible room
- separate testing room
- large type test booklet (18 pt.)
- marking responses in the test booklet
- permission for food, drink, or medical supplies in the test room
- extra breaks between sections
- stop-the-clock breaks within a testing section
- seating near the front of the room
- sign language interpreter to sign spoken instructions
- printed copy of spoken instructions with visual notification of start time, remaining, and stop times
- special equipment or furniture

(b) Documentation required:
- evidence of a disability from a qualified professional[6] who examined the candidate any time after the candidate reached the age of 13[7], and
- a statement that provides a reasonable explanation for why the candidate needs the testing accommodation to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate. The candidate may provide this statement. More than one statement may be provided in support of the request for testing accommodation.

The type of acceptable documentation is described in response to Issue 5, Part I.

(c) If a candidate meets these documentation requirements, which are not intended

---

[6] Throughout this report, our reference to evidence from a "qualified professional" means that the professional's report will conform to the standards of his or her profession.
[7] The Panel selected age 13 as the cut-off for documentation so that candidates seeking testing accommodations under this rule are treated comparably to candidates who seek testing accommodations under Paragraph 5(a) of the Consent Decree. Paragraph 5(a) candidates are able to receive testing accommodations comparable to what they received on the ACT or SAT, possibly on the basis of documentation from age 13. This cut-off is also consistent with the awareness of other testing entities that individuals with longstanding disabilities need not have more current documentation to justify testing accommodations. For example, ETS provides that certain basic accommodations, such as time and one-half, can be obtained with documentation that is older than five years. See https://www.ets.org/disabilities/documentation/documenting_learning_disabilities/#basic. This footnote's justification for the age 13 cut-off explains its use throughout this report.

to be extensive, and provides a reasonable explanation for why these testing accommodations are necessary to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate, then LSAC shall approve the requested testing accommodations, without requiring the candidate to provide additional information.

Category 2: Candidates should comply with these documentation requirements if they do not have a visual impairment and request up to 50 % extra time, or if they have a visual impairment, which requires taking the test in an alternative format, and request up to 100 % extra time.[8]

    (a) Documentation required:
- evidence of a disability from a qualified professional who examined the candidate any time after the candidate reached the age of 13, and
- a statement that provides a reasonable explanation for why the candidate needs the testing accommodation to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate. The candidate may provide this statement. More than one statement may be provided in support of the request for testing accommodation. The statement should be supported with appropriate data or other relevant information in support of the request.

The type of acceptable documentation is described in response to Issue 5, Part I.

    (b) If a candidate meets these documentation requirements, which are not intended to be extensive, and provides a reasonable explanation for why these testing accommodations are necessary to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate, then LSAC shall approve the requested testing accommodations, without requiring the candidate to provide additional information.

Category 3: Candidates should comply with these documentation requirements if they do not have a visual impairment and request more than 50% extra time, or candidate has a visual impairment, which requires taking the test in an alternative format, and requests more than 100% extra time.

    (a) Documentation required:
- evidence of a disability from a qualified professional who examined the candidate any time after the candidate reached the age of 13, and
- a statement that provides a reasonable explanation for why the candidate needs the testing accommodation to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate. The

---

[8] The expectation that candidates who have a severe visual impairment will need 100 % extra time to complete the examination is consistent with the practice of other testing entities. See, e.g., https://www.ets.org/disabilities/test_takers/disability_documentation/.

candidate may provide this explanation.  More than one statement may be provided in support of the request for testing accommodation. The statement should explain why more than 50% extra time is necessary so that the candidate's test results accurately reflect his or her aptitude or achievement levels.  The statement should be supported with appropriate data or other relevant information in support of the request.

The type of acceptable documentation is described in response to Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time.

(b) If a candidate meets these documentation requirements, which are not intended to be extensive, and provides a reasonable explanation for why these testing accommodations are necessary to best ensure that the LSAT results accurately reflect the aptitude or achievement level of the candidate, then LSAC shall approve the requested testing accommodations, without requiring the candidate to provide additional information.

**3.  <u>Reviewers</u>. The Panel shall consider and establish the appropriate qualifications for persons, such as LSAC staff and/or outside consultants, who make substantive adverse decisions on requests for testing accommodations.**

## Current Practice

LSAC currently has one staff person who does the preliminary review of all files, and a second staff person who makes the final determination.  The first-level reviewer has a master-level degree in special education; the final reviewer has a Ph.D. in clinical psychology.  The outside consultants include an ophthalmologist and a clinical psychologist.

## Panel's Recommendation

## General Reviewer Qualifications

Reviewers shall have a wide range of disability expertise to address the diverse needs of the test taker population, as described in response to Issue 1. Examples of professions of potential reviewers include: disability service providers, special education faculty members, school psychologists, clinical psychologists, medical doctors, learning disability specialists, and neuropsychologists in private practice.  Reviewers should have racial, cultural, and geographic diversity.  Each member shall possess a graduate degree in a field related to the impairment that is the basis for the accommodation request that is being reviewed (e.g., clinical psychology, school psychology, special education, speech and language, ophthalmology, physical impairments) and the following:

- Knowledge of the provisions of the Americans with Disabilities Act, as amended (ADA, 2008)

- At least five years of clinical, teaching, or research experience in (a) diagnosis and treatment of the relevant disability(ies) in his/her areas of expertise and (b) determination of appropriate testing accommodations related to the specific functional limitations associated with the type of disability(ies)

- Knowledge of documentation needed to support a disability in the relevant disability area and experience with different testing accommodations to mitigate typical limitations

- Knowledge of a wide variety of test instruments through graduate level coursework and job experience relevant to the disability specialty area

- Familiarity with professionally recognized diagnostic criteria appropriate to his or her areas of expertise

- Knowledge of how the disability may affect functioning in school, work, testing situations, and home

**4. <u>Qualified Professionals</u>. The Panel shall determine whether more than one qualified professional should review a documented request for testing accommodations before LSAC may deny the request in whole or in part.**

<u>**Current Practice**</u>



<u>**Panel's Recommendation**</u>

As discussed in response to Issue 8, the Panel recommends that all applications for testing accommodations that are not granted in full must be reviewed by one or two outside consultants.

**5. <u>Criteria and guidelines for reviewers</u>. The Panel shall consider and establish criteria and guidelines for use by persons who review or evaluate testing accommodation requests.**

## Current Practice

In its submission, LSAC stated: "the criteria and guidelines provided to individuals who substantively evaluate accommodation requests should be kept general and flexible." Review should be "focused on whether the individual seeking accommodations has a functional impairment that causes a substantial limitation in a major life activity relevant to taking the LSAT, and, if so, whether the accommodations the candidate requested, and/or some other accommodations, would be appropriate to address the candidate's functional impairment(s)."

## Panel's Recommendation

In its submission to the Panel, the United States Department of Justice ("DOJ") asserted, and the Panel found, that LSAC provides no guidance to its outside consultants who might be hired to assist with a review of a candidate's file.  By contrast, the Panel has recommended that LSAC shall have criteria and standards that comply with federal law and are consistent with the professional standards for diagnosing and accommodating various disabilities.

The Panel recommends that the granting of testing accommodations be a step-by-step process.  The first step is to establish that the candidate is an individual with a disability under the ADA (2008).  Under the relevant ADA Guidance, a testing entity, such as LSAC, should accept, without further inquiry, "documentation provided by a qualified professional who has made an individualized assessment of a candidate that supports the need for the modification, accommodation, or aid requested," and provide the testing accommodation. *See* 28 C.F.R. pt. 36, app. A, at 795.  "Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." *Id*. at 796.

Despite this Guidance, LSAC has rejected requests for testing accommodations even in cases where there is a clear history of the existence of a disability and the provision of prior testing accommodations. The Panel recommends that for individuals with a history of diagnosis of a disability, as well as for those more recently diagnosed with a disability, the existence of a disability shall be accepted if a qualified professional made the diagnosis and the candidate's documentation meets the recommended standards detailed below.  A "qualified professional" is a person who is "licensed or otherwise properly credentialed and possess[es] expertise in the disability for which modifications or accommodations are sought." 28 C.F.R. pt. 36, app. A, at 784.  Those standards require that a failure to have a prior diagnosis of a disability shall not be used as a reason to conclude that the candidate does not presently have a disability.

The second step involves the determination of what testing accommodation(s) should be provided.  Under the relevant ADA regulations, test entities must give

"considerable weight to documentation of past [testing accommodations] received in similar testing situations." The Consent Decree provides, and the Panel concludes it is a Best Practice, for LSAC to provide the equivalent testing accommodation(s) to an individual who has been previously provided such accommodations on a standardized examination, such as the ACT or SAT, so long as the individual continues to have a disability.

The Panel's review of sample files and interviews with LSAC staff suggests that LSAC staff does not give adequate weight to prior testing accommodations received by a candidate if the candidate was not previously provided testing accommodations on standardized examinations. The Panel recognizes that prior testing accommodations, such as extra time on university examinations, may have been in a somewhat different context or even for a somewhat different purpose. Nonetheless, the Panel concludes that an established history of testing accommodations shall presumptively support the request for the provision of similar testing accommodations on the LSAT. It shall be the role of the LSAC reviewer(s) to look for evidence that supports the candidate's request for testing accommodations, rather than to look for evidence that denies the candidate's request. The Panel found, based on its review of sample files, that LSAC's current practices especially disadvantage candidates who may have a history of testing accommodations at their university but who have not been required to take a nationally standardized examination to attain admission to their university.

Finally, the Panel's review of sample files and interviews with LSAC staff reveals that LSAC sometimes rejects requests for testing accommodations from individuals who do not request additional time, but rather request a testing accommodation to support specific physical or medical needs. The Panel concludes that, once the candidate documents that he or she has a disability and requests a testing accommodation, LSAC shall presumptively grant testing accommodation requests that do not involve requests for extended time. For example, LSAC should rarely, if ever, second-guess a request by an individual with diabetes to have food available while testing; a request by an individual with ADHD for a quiet testing environment, extra breaks or stop-the-clock breaks; a request by an individual with irritable bowel disease to have stop-the-clock breaks to use the restroom; or a request by an individual with a writing impairment or visual impairment to have a large-print test book or record answers directly on the exam instead of using a Scantron answer sheet.

In the materials that follow, the Panel sets forth Best Practices for the two-step process. First, we provide criteria for establishing whether or not a candidate has a disability ("Part I" below). Second, we provide criteria for determining whether LSAC should approve the candidate's request for testing accommodations ("Part II" below). To facilitate this review, we have placed the candidate's request into various, appropriate categories.

All reviewers shall begin the process with the presumption that the testing accommodation request is justified. In cases where a reviewer does not approve all of a candidate's requests for testing accommodations, the reviewer must provide a specific written explanation in support of that determination. In cases where the reviewer concludes there is a lack of documentation, the reviewer shall provide a clear statement of

what additional documentation is necessary so that the request for testing accommodation could be considered in the future. In addition, reviewers shall use criteria related to specific disabilities when determining testing accommodations. Nothing in these criteria or standards prevents the reviewer from using his or her professional judgment, but these decisions must be clearly explained in detail.

The following is a roadmap for the two-step process that reviewers must use in evaluating requests for testing accommodations.

PART I: Does the candidate have a disability?

1. Does the candidate have a record of a disability?

    a. Because deference should be given to the documentation from qualified professionals who have previously examined the candidate, adequate documentation of a disability, any time after the candidate reached the age of 13, shall include, but is not limited to:

        i. Documentation of disability in previous Individualized Education Program (IEP).[9] It is the recommendation of the Panel that candidates previously found to have a disability under the IDEA by their school district will be found to have a disability. A failure to use particular technical terms, such as dyslexia or ADHD, is not a reason to conclude there is no documentation of a disability when the documentation reflects the candidate has a history of a disability and the use of testing accommodations.

        ii. Documentation of disability in previous Section 504 Plan.[10] It is the recommendation of the Panel that candidates found to have a disability under Section 504 by their school district or university will be found to have a disability.

        iii. Documentation of disability in previous Summary of Performance. It is the recommendation of the Panel that candidates with a Summary of Performance pursuant to IDEA will be found to have a disability.

        iv. Documentation of disability in previous Private School Formal Written Plan. Because the Private School concluded a testing accommodation is appropriate, it is the recommendation of the

---

[9] An IEP describes the special education and related aids and services provided under the Individuals with Disabilities Education Act (IDEA).
[10] A Section 504 Plan specifies needed classroom accommodations and related aids provided pursuant to Section 504 of the Rehabilitation Act of 1973.

Panel that candidates with a Private School Formal Written Plan will be found to have a disability.

v. <u>Documentation of disability in an outside, private evaluation from a Qualified Professional.</u> Because more weight should be given to the views of a qualified professional who has examined the candidate than to the views of the LSAC reviewer, it is the recommendation of the Panel that candidates with such documentation will be found to have a disability.

vi. <u>Documentation of disability from a Medical Doctor Evaluation or Letter from a Qualified Professional.</u> Because more weight should be given to the views of a qualified professional who has examined the candidate than to the views of the LSAC reviewer, it is the recommendation of the Panel that candidates with such documentation will be found to have a disability.

b. If the candidate has a record of a disability, as provided above, then the candidate will be considered to have a disability so long as the candidate certifies that he or she continues to have a disability.

2. Does the candidate have a disability although the candidate does not have a record of a disability?

a. In making this determination, it is appropriate to consider the condition, manner or duration under which an individual performs a major life activity. For example, someone with a learning disability may achieve a high level of academic success, but may, nevertheless, be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, speak, write, or learn compared to most people in the general population. As Congress emphasized in passing the ADA Amendments Act, "[w]hen considering the condition, manner, or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who has performed well academically cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking." 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). Thus, an individual may receive average scores on a reading test, but his or her history may reveal special education placement in first grade and several years of individualized tutoring. Even as an adult, the individual may have trouble reading for long periods of time and the act of reading may still be difficult and effortful for this person as compared to most people. It is the recommendation of the Panel that such a person be considered to have a disability and be granted testing accommodations on the LSAT.

b. Evidence of a disability may include, but is not limited to:

   i. A qualified professional has provided documentation that the candidate has a disability, which restricts the candidate's ability to demonstrate his or her aptitude or achievement on all or part of the LSAT. Such documentation, when appropriate, may include: standardized test data from appropriate evaluation instruments; a comprehensive evaluation; a relevant history; or a personal statement describing the individual's disability, impairment, areas of limitation, effects on test taking and testing accommodation needs.

   ii. A qualified professional has provided documentation that an individual has a temporary disability, such as a broken bone in the candidate's dominant writing hand or herniated disk, which restricts the candidate's ability to demonstrate his or her aptitude or achievement on all or part of the exam.

c. Reviewers shall not presume that a candidate does not have a disability when there is no history of a disability or record of use of testing accommodations. A variety of factors can delay the identification of a disability, such as:

   • Attendance in an educational setting with few to no timed tests that lessens the impact and the noticeable signs of the disability
   • Receipt of informal testing accommodations provided by teachers
   • Attendance in a private school with small class size that lessens the impact and the noticeable signs of the disability
   • Attendance in a private school that does not provide testing accommodations or services to individuals with disabilities
   • Participation in an online school with alternate assessment formats such as oral tests or take-home exams that ameliorate the impact and lessen the noticeable signs of the disability.
   • An older student with history of academic difficulty, undiagnosed until later in life
   • History of home-schooling
   • History of receiving intensive tutoring outside of an educational setting
   • Reluctance to disclose evidence of disability for fear of stigma or discrimination
   • Attendance in a non-United States educational setting where standardized testing did not take place
   • Attendance in an educational setting where there are no systems in place to help families seek appropriate evaluations

3. The documentation necessary to demonstrate disability "should not demand extensive analysis." 29 C.F.R. § 1630.2(k)(2). "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. §1630.2(j)(1)(iii).

PART 2: What Testing Accommodation(s) are Appropriate?

LSAC staff shall engage in cooperative and interactive communication with candidates concerning any modifications or specific arrangements needed for the provision of testing accommodations.

1. Does the candidate have a record of receiving testing accommodations comparable to those sought for the LSAT?

    a. Considerable weight must be given to "past accommodations, modifications or auxiliary aids or services." 28 CFR § 36.309(b)(1)(v). Such evidence may include, but is not limited to, a record of:

        i. K-12 formal testing accommodations
        ii. K-12 informal testing accommodations
        iii. Postsecondary formal testing accommodations
        iv. Postsecondary informal testing accommodations
        v. Attendance at a specialized school that provided such testing accommodations to all students
        vi. Similar testing accommodations provided on previous standardized or other examinations
        vii. Similar testing accommodations provided through a previous IEP, Section 504 Plan, Summary of Performance, Private School Formal Written Plan, or any other relevant document

    b. If the above evidence exists, then the candidate shall be provided testing accommodations comparable to those provided previously unless the candidate is seeking more than 50% extra time. If the candidate is seeking more than 50% extra time and does not have a visual impairment then the candidate must provide the documentation provided in Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time.

    c. Even though a candidate does not have a formal history of receiving testing accommodations, this fact alone does not negate the candidate's present need for testing accommodation(s). An individual with a disability may not have a prior history of formal testing accommodations, even though testing accommodations are currently appropriate.

2. Does the candidate have proper documentation to support a current testing accommodation even if the candidate has not previously received testing accommodations?

    a. The candidate should provide documentation to justify each requested testing accommodation but the burden on the candidate shall be no higher than would have been placed on the candidate if he or she had sought such testing accommodations earlier in his or her educational career.

    b. Such documentation must include a report from a qualified professional in support of the disability diagnosis.

    c. The candidate, a qualified professional, or a teacher must provide a reasonable explanation for each testing accommodation as it relates to the candidate's disability.

    d. Where the candidate, qualified professional, or teacher recommends the provision of extra time, there is a clear explanation of why a specific amount of time is requested. The extra time request, that is appropriately documented, shall be granted by the reviewer without additional documentation requirements unless the candidate is seeking more than 50% extra time and does not have a visual impairment.

    e. An LSAC reviewer shall not deny a testing accommodation merely because it appears to be redundant, such as a request for both text to speech and a reader, so long as the candidate provides a reasonable explanation for the need for the requested testing accommodations.

3. Minimum Standards for Various Disabilities

    a. Although testing accommodations should be determined on an individual basis, it is also appropriate for LSAC to consider fairness to similarly-situated candidates in determining the amount of extra time to provide to individuals with certain, high-incidence disabilities. We have provided minimum standards that LSAC shall use when determining if a request for a testing accommodation is appropriate. Candidates may seek additional time, beyond these minimum standards, by meeting the additional documentation described in Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time. A candidate with multiple disabilities need only meet the documentation requirements for one disability in order to qualify for the minimum standards.

    b. The minimum standards include:

        i. Learning Disabilities. It is the Panel's recommendation that individuals with documented learning disabilities shall be given a

minimum of 50% additional time. Candidates seeking more than 50% extra time must comply with the documentation requirements specified in Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time. Candidates granted 100% or more time shall be granted permission to take the test over two days, if requested.

ii. ADHD. It is the Panel's recommendation that individuals with an established diagnosis of ADHD shall be given a minimum of 50% additional time. Candidates seeking more than 50 % extra time must comply with the documentation requirements specified in Standards for Determining More Than Fifty Percent Extra Time. Candidates granted 100% or more extra time shall be granted permission to take the test over two days, if requested. Additional breaks shall also be recommended based on past testing accommodations. Candidates may request off-the-clock breaks, during which time is stopped and restarted when they are able to proceed, as full or partial alternatives to extra time. One minute shall be added to the overall time for each break to account for the disruptive effects of such breaks.

iii. Psychiatric Disorders. It is the Panel's recommendation that individuals with an established diagnosis of major psychiatric disorders shall be given a minimum of 50% additional time, and extra breaks, as requested. Candidates seeking more than 50% extra time must comply with the documentation requirements specified in Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time. Candidates granted 100% or more time shall be granted permission to take the test over two days, if requested. Such individuals may request the use of stop-the-clock breaks during the testing period while time is stopped and restarted when they are able to proceed. One minute shall be added to the overall time for each break to account for the disruptive effects of such breaks.

iv. Visual Impairments. Individuals who are diagnosed as blind or with severe visual impairments, which preclude them from reading standard-sized print, shall be allowed to use the testing accommodations that they document they have used in the past. Candidates using a reader, computer reader (text-to-speech), braille or other similar alternatives shall be granted 100% extra time. Candidates requesting more than 100% time must have clear documentation for time above this amount. Individuals granted 100% or more time shall be granted permission to take the test over two days, if requested. Additional breaks shall be granted, upon request, due to the length of each testing session.

     v.  Pain-Related Conditions and Chronic Medical Disorders (e.g., diabetes, seizures, fibromyalgia, gastrointestinal disorders, arthritis, back disorders which prevent sitting or standing for long periods). For those individuals with documentation of substantial medical issues that prevent them from focusing on the test for continuous periods of time (for example, an individual with Crohn's Disease may need unscheduled bathroom breaks) such individuals may request the use of stop-the-clock breaks during the testing period in which they request that time be stopped and restarted when they are able to proceed. One minute shall be added to the overall time for each such break to account for the disruptive effects of such breaks. If the disorder also results in cognitive impairment, such as changes to memory or attention when the individual is not having acute issues, the individual shall also be considered for 50% additional time. Candidates requesting more than 50% time must have documentation for time above this amount, as provided in Issue 5, Part II, Standards for Determining More Than Fifty Percent Extra Time, but may not use the impact of such factors as going to the bathroom which is already covered by the time-stopping procedure. These individuals may also request permission to use special chairs or devices. LSAC shall grant these types of requests on a routine basis.

     vi.  Writing Disorders. LSAC shall approve requests for the use of a computer, and spell check, for any individual with the history of using such assistive devices in school or work settings, as well as for any individuals with more recent injuries or impairments where writing would be difficult or slow. Individuals with a history of additional time shall receive 50% additional time, as shall individuals without such a history where a reasonable explanation exists.

## Standards for Determining More Than Fifty Percent Extra Time

It is the Panel's opinion that 50% additional time is a reasonable amount of additional time in most cases. However, some individuals have exceptional needs that justify the request for a testing accommodation of more than 50% additional time. In such situations, the qualified professional should provide a rationale based on history and objective evidence for the request for more than 50% extra time. The rationale must be reasonable and understandable to the reviewer(s) with appropriate expertise. Examples of appropriate justifications include, but are not limited to:

    1.  On any past standardized test, the candidate was provided with more than 50% extra time. For all disorders, where more than 50% extra time can be shown to have been granted as a consistent testing accommodation, and was approved by

an appropriate professional, more than 50% extra time shall be provided, consistent with prior practice.

2. The qualified professional provides documentation with a reasonable explanation that supports the need for more than 50% extra time.  In cases where no history of equivalent extended time on past standardized test scores is available, such as in the cases of individuals from another country, a person with a temporary or recent disability, or a person with a recent diagnosis, judgment of the need for additional time must be made based upon the documentation presented by the professional. The discussion would include the rationale for the need for additional time, and further explanation of the severity of the disorder(s), including relevant information such as co-morbidity with other disorders. In rendering a decision, the reviewer shall give substantial weight to the recommendation of the qualified professional.

3. The qualified professional provides documentation containing a reasonable explanation that supports the need for extra time on certain sections of the test, but not others. For example, for individuals with visual impairments who routinely are granted 100% extra time, 150% extra time shall be allowed on the analytical reasoning section of the LSAT exam because of its reliance on visual-spatial abilities. Another example would be for individuals with learning disabilities that specifically impact math reasoning or problem solving. These individuals may warrant 50% extended time on most parts of the LSAT, but 100% time on the analytical reasoning section. If it is impossible because of administration constraints to provide variable time on different sections, LSAC shall grant the individual extended time on all sections of the test, consistent with the recommendation for the longest requested extra time on one section of the test.

4. The provision of more than 50% extra time shall be approved if a postsecondary disability service provider provides a signed statement indicating that a candidate was provided with more than 50% additional time on college examinations.  In such instances, the candidate shall then be granted the same amount of additional time provided on college exams.

5. The provision of more than 50% extra time shall be given to an individual who, because of documented health or sensory impairments or psychiatric disorders, warrants such time to demonstrate his or her achievement or aptitude. For example, a person with depression or anxiety may have impaired working memory or processing speed that would normally be accommodated with 50% extended time. However, that person may also have dysgraphia (fine-motor deficiencies) and/or executive deficits related to a separate psychiatric disorder or ADHD. Given the concurrent diagnoses and functional limitations, more than 50% extra time shall be granted.

6. As long as sufficient evidence is presented, LSAC shall grant the candidate more than 50% extra time. It is further recommended that LSAC does not attempt to alter the request for an extended time testing accommodation, such as suggesting

75% additional time for an individual who has requested double-time (100% time extension). Because there is no precise or accurate way to determine the exact amount of time needed by an individual, LSAC shall give preference to the recommendation of the qualified professional who provides documentation and a reasonable explanation of the need for the time extension.

7. A reviewer may use clinical judgment to support a candidate's request for extended time. For example, in cases where the candidate's past test scores are inconsistent with his or her cognitive abilities and prior educational achievements, extended time may be warranted.

8. In cases where the request is clearly justified by the qualified professional and previous LSAT test performance, if available, reviewers may recommend triple or quadruple time, although this testing accommodation request would only be granted in rare cases.

9. In cases where the request is for a 100% time extension or greater and a reasonable explanation is provided, the test shall be administered over two consecutive days, if the candidate requests that testing accommodation.

**6. Written recommendations from reviewers. The Panel shall consider whether there should be particular parameters for written recommendations from any outside consultant who reviews or evaluates requests for testing accommodations and, if so, what those parameters should be. The Panel shall also consider whether there should be particular parameters for internally documenting written decisions by LSAC personnel who make substantive decisions on requests for testing accommodations and, if so, what those parameters should be.**

**Current Practice**

At this time, LSAC has no requirements for written recommendations from reviewers.

**Panel's Recommendation**

As discussed in response to Issue 8, the Panel recommends that both in-house staff and outside consultants shall be required to follow certain guidelines in writing reports to justify their recommendations if they recommend that LSAC not approve in full a testing accommodation request.

**7. Written explanations for denials of testing accommodation requests. The Panel shall consider whether there should be particular parameters for written explanations provided by LSAC to candidates whose requests for testing accommodations are partially or fully denied and, if so, what those parameters should be.**

**Current Practice**

LSAC stated in its submission to the panel that its "current practice [is] to provide a descriptive response to individuals whose requests for testing accommodations are denied.

If it appears that more information could be provided to support the request, LSAC will generally identify to the candidate the type of information that might be helpful."

**Panel's Recommendation**

As discussed in response to Issue 8, the Panel recommends that in-house staff and outside consultants shall prepare a clear written explanation to support their decision regarding testing accommodations requests. In cases where the candidates' requests for testing accommodations are not approved in full, the candidates shall be informed, in writing, why each of their requests for testing accommodations are not approved in full[11], and what additional information, if any, could lead LSAC to approve their requests in the future. An explanation of the appeals process (described in response to Issue 9) shall be included in all correspondence to candidates whose requests for testing accommodations are not approved in full.

**8. Automatic review of partial and full denials. The Panel shall consider whether an automatic review of partial and/or full denials is warranted and, if warranted, how such a review should be conducted.**

**Current Practice**

According to the written submission provided to the Panel by LSAC:

[I]t is LSAC's current practice to have at least its two internal professionals review a request before a request is denied in full. LSAC does not believe that any other "automatic" review should be necessary. Again, interests of efficiency, timeliness, and consistency favor having a smaller, but dedicated, team of individuals reviewing accommodation requests.



---

[11] The phrase "not approved in full" is intended to include situations where LSAC denies a testing accommodation request due to a lack of documentation. Such denials will be subject to the outside consultant review rules.

███████████████████████████████

**Panel's Recommendation**

      The Panel recommends an automatic review by one or two outside consultants of all applications for testing accommodations that are not approved in full by LSAC. This mandatory use of outside consultants is to be distinguished from the appeals process, which will be described in response to Issue 9. LSAC must meet the guidelines and deadlines specified below.

- Except for situations in which a candidate acquires a temporary or permanent disability after the date for registering for the exam, a candidate must submit all their records in support of a testing accommodation by the applicable registration deadline. When a candidate unexpectedly acquires a disability after the registration deadline, LSAC should then waive the regular deadlines and make every effort to accommodate the candidate. The Panel understands that this recommendation goes beyond its authority under the Consent Decree but believes it is a Best Practice. That practice is consistent with the practices of many other testing entities such as the College Board.[12]

- The Disabilities Specialist shall review each file and make a recommendation whether to approve the requested accommodations in full, to approve in part, or to deny in full. He or she will then prepare a written summary based on a checklist of decision-making criteria (as described in response to Issue 5) that explains the reasoning for that decision, using a holistic approach to the file. This review shall occur within two business days of the Disabilities Specialist receiving a completed file.[13]

- At this time, LSAC employs one Disabilities Specialist. If LSAC cannot meet this first-level review deadline by relying on one Disabilities Specialist to review all files then LSAC shall hire additional, qualified staff as Disabilities Specialists to make that deadline feasible. Employing adequate, qualified staff is a Best Practice.

- The recommendation of the Disabilities Specialist, along with the file, shall be transmitted to his or her supervisor, the Manager of Accommodated Testing. The Manager of Accommodated Testing shall review the file within two business days, which may include consultation with the first level reviewer. In all cases, the Manager of Accommodated Testing shall approve the requested testing

---

[12] *See* https://www.collegeboard.org/students-with-disabilities/temporary-conditions.

[13] We understand that the review process we have created is completed within two weeks. That constraint was required by LSAC's registration deadlines. Other testing entities, such as ACT and the College Board, have much earlier test registration deadlines for all candidates, allowing for a longer review period. Because we agree that review of denials by outside consultants is a Best Practice, and that an appeals process is also a Best Practice, we were forced to devise a timeline that was consistent with LSAC's registration deadlines.

accommodation in full, or write a clear rationale explaining the decision not to approve a testing accommodation request in full.

- If the Manager of Accommodated Testing approves the full request for testing accommodations then the written summaries based on the checklist of decision-making criteria produced by the LSAC staff shall be retained in LSAC's records to be reviewed in the future for consistency or training purposes.
- If the Manager of Accommodated Testing reverses the Disabilities Specialist in more than 25% of requests for testing accommodations in a given testing cycle, then an additional training obligation shall be implemented for the Disabilities Specialist, as discussed in "Best Practice" 10 below.
- The Manager of Accommodated Testing shall make a decision to approve or deny requested testing accommodations within 4 working days of LSAC staff designating a file as being "complete."
- If the Manager of Accommodated Testing approves a requested testing accommodation in full, then the candidate shall receive a communication within one business day stating that his or her testing accommodation request has been approved in full.
- If the Manager of Accommodated Testing does not approve in full each of the candidate's requests for testing accommodations, then the consideration process shall continue with the use of one or two outside consultants.
- The file shall be transmitted to one or two outside consultants, selected by LSAC from a list of experts who meet the qualifications stated earlier in this report under Issue 3 and whose expertise is appropriate to the case, depending on the conclusion of the first consultant as discussed below.   The file that is transmitted to the outside consultant(s) shall include all the written summaries prepared by LSAC staff to justify their decision.
- When a review is scheduled, one outside consultant will be immediately contacted to indicate to him or her that a file is to be reviewed. He or she will be requested to review that file within 2 working days.  If the consultant indicates that he or she cannot meet that deadline (or fails to respond within one business day), then LSAC staff will contact the next person on the list until one is found who can review the file within 2 working days.
- The outside consultant will have the choices of:
  o agreeing with the candidate's request in full (reversing the decision of LSAC not to approve the request in full),
  o agreeing with the LSAC decision not to approve in full the candidate's request for testing accommodations,
  o or suggesting a partial approval.  Such a partial approval may not include rejection of testing accommodations that the LSAC's Manager of Accommodated Testing has already approved, but it may provide further approval of additional time or longer breaks, as requested by the candidate.
- The outside consultant will provide a justification of his or her decision in writing.
- In cases where the outside consultant agrees in full with the position of the

candidate, then the candidate's requests will be identified as approved in full. The outside consultant's determination will become the final determination of LSAC for that candidate's request for testing accommodation. The candidate will be notified within one business day that his or her request for testing accommodation has been approved in full.

- If the outside consultant does not approve the original request in full, a second reviewer will be selected and proceed as above. The second reviewer will have all the original documentation, LSAC written summaries, and the written summary from the first reviewer.
- The second reviewer will have the choices of:
  - o approving the original request,
  - o accepting the partial approval suggested by the first reviewer, where applicable, or
  - o supporting LSAC's initial stance where the first reviewer also accepted LSAC's initial stance
- The second outside consultant will provide a justification of his or her decision in writing.
- Where a second outside consultant is used as part of the determination process, the decision by the second outside consultant is the final decision on the request for testing accommodation.
- If the second outside consultant recommends approval of the candidate's testing accommodation request, in full, then that decision shall be transmitted to the candidate within one business day.
- If the candidate's request for testing accommodation is not approved in full after review by the two outside consultants, LSAC will transmit a decision letter within one business day to the candidate that explains the rationale for the decision based upon the documentation provided by the candidate. The letter will address those aspects of the documentation and request for testing accommodations that contributed to the decision. Quoted statements from the written summaries and checklist indicators shall form the content of these letters. In this manner, the process will be a transparent and objective one that is communicated to the candidate. The letter shall also include clear suggestions, with examples, for any additional information that might be helpful in the appeal process. Additionally, an explanation of the appeals process (described in response to Issue 9) shall be included in all correspondence to candidates whose requests for testing accommodation were not approved in full.

**9. Timely/streamlined appeals process. "The panel shall consider whether there should be a process available, beyond that already provided by LSAC, to candidates who wish to seek review of LSAC's decision to deny a candidate's request and, if so, what that process should be relative to LSAC's existing registration deadlines."**

**Current Practice**

According to the submission provided to the Panel by LSAC:

On prior occasions, LSAC has considered whether it could add an "appeal" procedure to its accommodation review process. The practical impediment is that many candidates wait until very close to the registration deadline to submit their requests for testing accommodations. There simply is not enough time for LSAC to process these requests in the ordinary course, and then allow a full "appeal" process, prior to test administration. Unfortunately, because of DOJ interpretive guidance, testing entities cannot require testing accommodation requests to be submitted in advance of the standard registration deadlines, so as to provide a separate block of time specifically for handling requests and allowing an appeal process.

Although the relevant title of the ADA (Title III) does not require an appeals process, LSAC has a reconsideration process in place that essentially operates as an appeals process. Candidates can appeal for any reason – including a belief that LSAC simply made the wrong decision. In many instances, LSAC responds to such requests by sending the file out for external review, based upon the facts in a given case. LSAC believes that this approach is reasonable and constitutes a "best practice."

In our interview with LSAC staff, we learned that LSAC does not have what would traditionally be considered an "appeals process." LSAC uses internal staff, and, on occasion, two outside consultants, to reconsider its decision. A genuine appeals process does not exist whereby a neutral third party reviews LSAC recommendations using a designated, transparent appeals process. In addition, the discretionary practice of using outside consultants of LSAC's own choosing does not constitute an "appeals process."

LSAC's current practice is to inform a candidate who wants further reconsideration after the regular registration period that the time to supplement the file has elapsed, and no decision can be made for that testing cycle.

**Panel's Recommendation**

- The Panel recommends that the candidate shall be able to submit an appeal up to twelve days before the actual administration of the exam and, depending on the request, could even be continued further. As examples, a request to reverse denial of extended time could be decided within days of the test as could a request from someone with a temporary disability, such as a broken dominant hand, to word process the exam or use a scribe.

- When a candidate is notified that his or her request for testing accommodation has not been approved in full, the candidate shall receive within one business day a comprehensive decision letter explaining the rationale for the denial using language described in the internal and consultant written summaries as described above. The candidate will then be provided at least four days to submit an appeal. More than four days can be provided to the candidate to

provide an appeal if that appeal can be received within twelve days before the scheduled test date.

• If the candidate desires more than four days to transmit an appeal, and those additional days would cause the file to be received less than twelve days before the scheduled test date, then the candidate can request that his or her application for testing accommodations be rolled-over to the next LSAC testing cycle with no additional cost.

• The candidate will have at least 24 hours after receiving notification of a partial or full denial of a testing accommodation request to indicate if the candidate desires to appeal. (More than 24 hours can be provided in cases where the candidate had filed the original request for testing accommodation before the registration deadline.)

• As soon as the candidate indicates that he or she will be submitting an appeal, LSAC shall contact two outside appeals consultants (using the process described above) to ensure their availability in the event that the appeals process is invoked. These reviewers will be notified that they will have only one day (i.e., 24 hours) to respond to the appeal request once it is received.

• When LSAC receives an appeal from the candidate, then LSAC has 24 hours to decide to grant the candidate's request for testing accommodations without invoking the appeals process.  If LSAC chooses to grant the request for testing accommodation after receiving the appeal, then the candidate shall be informed of that decision within one business day.

• If LSAC chooses not to grant the candidate's request in full, then the appeals process will commence within 24 hours through the use of the two outside appeals consultants.

• The appeal submitted by the candidate will then be processed by the outside appeals consultants, as described in Issue 8, but the outside appeals consultants will agree to respond within one day from transmission of the file.

• The result of the appeal shall be provided to the candidate within one week of the submission of the appeal.  LSAC will never refuse to provide the results of an appeal (or a full consideration) because there is insufficient time to implement the requested testing accommodation for that examination cycle, unless the candidate indicates that he or she would like to terminate the testing accommodation request.

• An appeal, will be rendered for candidates by the following sample dates, assuming the file was complete by the regular registration deadline:

   o Sample June 9, 2014 testing scenario (using consideration and appeal process, as described above):

- Tuesday, May 6, 2014: regular registration deadline

- Thursday, May 8, 2014:  recommendation by first-level reviewer, the Disabilities Specialist.

- Monday, May 12, 2014:  review of that decision by the Manager of Accommodated Testing. The Manager of Accommodated Testing will provide an explanation in writing in support of his or her decision not to approve a testing accommodation request in full.

- If the Manager of Accommodated Testing accepts the candidate's request for testing accommodations in full, then the candidate will be notified of that approval on Tuesday, May 13, 2014.

- If the Manager of Accommodated Testing does not approve the candidate's requests for accommoation in full then the consideration process continues.

  - Wednesday, May 14, 2014:  consideration of denial complete by first outside consultant.

    - If that determination is an approval of the testing accommodation, then file is approved.  The candidate is notified of approval by Thursday, May 15, 2014.

    - If that determination is not to approve a candidate's request for testing accommodation in full then the file is reviewed by a second outside consultant who will render a decision by Friday, May 16, 2014.

    - If the second outside consultant concludes that the candidate should receive the testing accommodation(s) requested, then the candidate will be notified on Monday, May 19, 2014 that request has been approved in full.

    - If the second outside consultant does not approve the candidate's request for an accommodation in full then the candidate will be provided an explanation of that decision by Monday, May 19, 2014, and informed of his or her right to appeal the decision.

    - The candidate will be asked to indicate within 24 hours (Tuesday, May 20, 2014) whether he or she intends to appeal the denial. If the candidate states

that he or she intends to appeal, LSAC will immediately secure two different outside consultants with expertise in the disability area to review the appeal.

o   The candidate will be provided four days, until Friday, May 23, 2014, to transmit an appeal of the decision.  In their appeal, the candidate may request a different testing accommodation than requested in his or her original request for testing accommodations.

o   Upon receipt of the appeal, LSAC will either approve the requested testing accommodation(s) in full within 24 hours (May 24, 2014) or, within a further 24 hours (by Sunday, May 25, 2014) after review of first appeal outside consultant who had been selected, as described above.  That individual will have 24 hours  (until Monday, May 26, 2014) to make a determination about the appeal.

o   The first outside appeals consultant may:

▪   Approve the candidate's testing accommodation request, as stated in appeal, in full.

▪   Grant a partial request of testing accommodations sought by the candidate, not to be less than LSAC's original determination, or

▪   Concur with LSAC's initial determination.

o   If the outside appeals consultant does not approve the candidate's testing accommodation request in full then LSAC will transmit the appeal to a second outside consultant, who was already selected, as described above.

o   The second outside appeal consultant will make a determination within 24 hours (Tuesday, May 27, 2014) and will choose between the recommendation of the first outside appeals consultant and the candidate's request.

o   LSAC will communicate with the candidate by Wednesday, May 28, 2014 to provide final decision.

      ○  LSAC will implement the testing accommodation determination by June 9, 2014.

**10.  Training.  The Panel shall consider and establish the parameters, such as content and timing of, training for persons (both LSAC staff and outside consultants) who evaluate or review testing accommodation requests.**

**Current Practice**

According to the submission provided to the Panel by LSAC:

For outside consultants, it is LSAC's position that annual training would be reasonable and a "best practice." The training could cover any changes in LSAC's policies or practices, answer frequently asked questions, and provide a question and answer session among the outside consultants, LSAC's Manager of Accommodated Testing, and LSAC's general counsel.

For LSAC staff, annual in-person training would likewise be reasonable, in terms of a formal, structured training session. No such formal in-house training currently occurs. The training could be conducted by LSAC's general counsel, potentially in conjunction with outside counsel and/or an outside consultant, and could cover any changes in LSAC's policies and practices. This would also allow LSAC staff to raise questions or address frequently occurring issues.

As a practical matter, because of the small size of LSAC's Accommodated Testing staff, "training" happens informally on an almost-daily basis, through frequent interactions among staff. In addition, LSAC staff routinely attend continuing-education sessions at external meetings and conferences. In this light, more frequent "formal" training does not appear necessary, beyond adding an annual formal training session as discussed above.

**Panel's Recommendation**

- LSAC staff and all outside consultants shall attend an annual two-day training session that includes presentations by experts in the field who have knowledge and training in testing accommodation issues and experience conducting training for other testing agencies such as the ACT, ETS, or College Board. During the Consent Decree, at least one member of the Panel appointed by DOJ and one member of the Panel appointed by LSAC, who has approved all of the recommendations of the Panel, shall participate in this training session.

- Training would include how to evaluate requests for testing accommodations based on: a stated presence of disability, history of provision of testing accommodation or rationale for lack of testing accommodation use, rationale for late diagnosis if appropriate, candidate's self statement, and recommendations

of the evaluator or previous disability service providers or teachers.  An opportunity to receive feedback will be provided. Training will include review of mock cases in order to become familiar with the Panel's recommendations for practice. Trainings would also include a summary of the legal landscape by one of the attorneys recognized in the field for litigating cases on testing accommodations on national admissions, professional, and/or licensing exams.

- Training shall meet the following minimum objectives:

    o   to educate reviewers regarding  the application of the ADA to testing accommodations analysis generally, and with respect to  learning and attention disabilities specifically;

    o   to provide reviewers with standards for evaluating requests for testing accommodations;

    o    to instruct reviewers on what information shall be contained in their written recommendations,   where applicable.

- LSAC shall keep internal data on: (1) the frequency with which the Manager of Accommodated Testing reverses the recommendations of the first-level reviewer, and (2) the frequency with which the Manager of Accommodated Testing's final decision is reversed by the outside consultants during the consideration or appeals process.  If any of the reports required by paragraph 23 of the Consent Decree demonstrate that the rate of reversal exceeds 25% during any testing cycle, then the relevant staff member shall receive additional training. The purpose of this training would be to provide constructive feedback to prospectively lower the reversal rate in the future. The nature and timing of that training will be determined by DOJ, in consultation with DFEH, on a case-by-case basis depending on the reasons for the reversals.